# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARLENE L. JOHNSON,

        Plaintiff,

v.                                         No. CIV 03-941 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Marlene L. Johnson ("Johnson") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Johnson was not eligible for disability insurance benefits ("DIB"). Johnson moves this Court for an order reversing or remanding the administrative agency procedure. [Doc. 11.]

Johnson was born on May 28, 1940 and was 62 years old when the administrative hearing was held. [Tr. at 64.] She was closely approaching retirement age. Johnson has a partial college education, consisting of three semesters of college and special job training from 1979 to 2000. [Tr. at 19, 106.] She has past relevant work experience as a state welfare worker and a state child support officer. [Id.] She is Native American, married and lives with her husband who retired from the federal government. [Tr. at 37.]

Johnson worked for the State of New Mexico for 21 years from 1979 until May 15, 2000, when she retired with 20 years of service. [Tr. at 89, 91.] She was diagnosed with diabetes in 1975 [tr. at 156], and on July 24, 2000, she applied for DIB, alleging an onset date of disability of May 15, 2000, allegedly due to effects of diabetes mellitus, blurred vision and anxiety. [Tr. at 19, 64.]

On September 6, 2002, ALJ Vanderhoof held Johnson's administrative hearing, during which Johnson represented herself. [Tr. at 33.] On October 21, 2002, Judge Vanderhoof denied Johnson's application for disability benefits. The ALJ concluded, in part, that Johnson's diabetes was a severe medical condition but that it did not satisfy listing requirements. He determined that Johnson could perform a limited range of light work and was able to return to her past relevant work as a state child support enforcement officer based on her description of that work. [Tr. at 26.] Thus, she was not disabled. [Tr. at 15-27.] On July 13, 2003, the Appeals Council denied Johnson's request for review. [Tr. at 5.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

---

[1] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9] Here, the ALJ reached his disability determination at step four of the sequential evaluation process.

---

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After a thorough review of Johnson's medical records, symptoms and complaints, along with all medical opinions, Judge Vanderhoof rejected her claim at step 4. In reaching this decision, the

ALJ made the following findings: (1) Johnson did not engage in substantial gainful activity as of the date of May 15, 2000, the alleged onset of her disability; (2) Johnson had a "severe" impairment consisting of diabetes mellitus; (3) the severe impairment did not meet or medically equal one of the listed impairments; (4) Johnson's other impairments, including blurred vision, obesity, left leg and feet problems, and depression were not severe impairments; (5) Johnson's allegations regarding her limitations were not totally credible; (6) Johnson retained a RFC for a limited range of light work that did not require lifting more than 10 pounds occasionally, standing or walking more than four hours in an eight hour day, more than occasional kneeling, crouching, and bending and reaching, and that she could write, type, and handle small and large objects and that her ability to sit was unlimited; (7) Johnson's past relevant work as a child support enforcement officer did not require the performance of work-related activities precluded by her RFC; (8) her diabetes mellitus did not prevent her from performing her past relevant work; and (9) there was no basis to reopen Johnson's prior application for disability benefits. [Tr. at 26.] In sum, Judge Vanderhoof concluded that Johnson was not disabled as defined by the Social Security Act at any time through the date of his decision. [Tr. at 26.]

## Summary of Johnson's Employment and Medical History

From May 1979 until October 1987, Johnson worked as a state welfare worker. From October 1987 until the date she retired in May 2000, she was a state child support enforcement officer. [Tr. at 114.] She stated on a disability work history report that on "June 1, 2000 I retired due to my eligibility of New Mexico State Personnel Regulations." [Tr. at 121.]

Although Johnson was diagnosed with diabetes in 1975, the medical records begin in 1999. On January 13, 1999, Johnson was seen by optometrist Donald Leach. Her vision was corrected in

both eyes to 20/20. [Tr. at 146]. On April 16, 1999, Johnson was given a routine check-up by her treating physician, Dr. Friedenberg. The record reflects that Johnson thought her blood sugars were better. The record also notes that she had been in a prior motor vehicle accident (in December 1997) resulting in an injury to her left leg that developed an abscess after the accident. However, the abscess cleared up. She complained that her knee buckled at times but there was no pain or swelling. She was exercising and watching her diet. She felt that her blood sugars went up when she felt anxious, and she stated that she did get somewhat anxious at work sometimes. [Tr. at 169.] According to the doctor, she had done reasonably well with the diabetes but "of course" could have done better. There were no other significant problems. The question at the time was whether to increase her insulin or try another oral agent. The record notes that Johnson had eye appointments from time to time and had no visual complaints or headaches. She denied urinary problems. Her weight was 161 pounds at the time, and she exercised quite well. Her feet were in good condition and there were no ulcerations or sores. She had a mild degree of diabetic nephropathy. [Tr. at 169.]

On August 10, 1999, Dr. Leach again saw Johnson related to her vision, but the record does not appear to reflect anything unusual about her eyes or vision. [Tr. at 145]. On August 17, 1999, she told Dr. Friedenberg that her sugars were doing very well and that she felt fine. [Tr. at 167.] She had no sores or ulcerations on her feet. [Tr. at 167.] On December 14, 1999, she called Dr. Friedenberg's office to request a referral to a podiatrist. [Tr. at 164.] The record does not indicate what problems, if any, Johnson was having with her feet, and there are no medical records from a podiatrist. On December 29, 1999, Dr. Friedenberg saw Johnson for a yeast problem. She told the doctor that her blood sugars were not too bad, but he increased her insulin. [Tr. at 162.]

On January 21, 2000, Johnson again saw Dr. Friedenberg for the yeast problem. She reported thinking that her blood sugars were excellent. She was feeling fine. The doctor noted no weight loss, and no urinary or bowel problems. Her feet had been all right. [Tr. at 160.]

On May 15, 2000, Johnson retired from her job. She alleges that May 15, 2000 was the onset of her disability, based on diabetes mellitus, blurred vision and anxiety. [Tr. at 19, 64.]

On May 23, 2000, Dr. Friedenberg wrote that her blood sugars sounded as if they were very good, but noted that they had not been very good the last time. [Tr. at 158.] Her rash had disappeared. She denied headaches, dizziness or chest problems. Johnson reported no urinary or bowel complaints. "Her feet have been fine." According to this record, she was "really doing very well."

On June 22, 2000, Johnson saw Dr. Samuel Smith at Presbyterian for her annual OB-GYN appointment and exam. [Tr. at 153, 156.] She reported occasional stress urinary incontinence. The record reflects that Johnson and her husband ran a small ranch near Los Lunas with 60 head of cattle and that she engaged in farm work on a daily basis. Johnson provided affidavit testimony that it was not accurate that she was actively running the ranch or doing farm work on a daily basis. This medical record also notes that she, her mother, sister and brother were all diabetic. Johnson was 5 feet tall and weighed 176 pounds at this time.

On July 20, 2000, Johnson filled out the first of several daily activities questionnaires for her disability benefit application, she was filed several days later. [Tr. at 87.] On the questionnaire, she wrote that she used to jog 3-5 miles per day but could no longer jog due to fatigue. She became tired if she walked more than 10 minutes and needed to rest after walking. Johnson could not climb steps because she would lose her balance due to her left thigh where she had had surgery. She sometimes

used a stick or leaned on her husband's arm for balance. On the form she stated that she weighed 140 pounds. [Tr. at 88.] She got along with people fine and had no problems with being outside. Johnson reported problems with threading a needle due to her vision. She could make decisions on her own. She listed the medications she was taking for her diabetes at the time, including insulin. She also wrote that for the last three months at her job, she could not meet the required work-related quotas due to a disorganized computer system, enormously high case loads and stress. [Tr. at 89.] Johnson indicated that she retired with 20 years of service with the State in accordance with the State's requirements. Nothing in this record indicates that Johnson retired because of her diabetes. [Tr. at 87.]

On July 24, 2000, Johnson signed her DIB application form and filled out a disability report. [Tr. at 64, 99.] She stated on the disability report that she weighed 140-155 pounds. [Tr. at 99.] On this occasion, she wrote that diabetes kept her from working. According to Johnson, she had all the symptoms of diabetes, including blurred vision, anxiety and fluctuating moods. She reported that she used to go out in the field for her work but that her duties had changed to office work due to her diabetes. Johnson explained that she did not receive vocational or job training services because of her age and medical condition. [Tr. at 107.]

On August 24, 2000, Johnson was seen for the first time by Dr. Robert Galagan. He was assuming the care of Johnson's diabetes. [Tr. at 151.] She had type II diabetes of 25 year duration. [Tr. at 151.] Johnson had a history of diabetic nephropathy with micro-albuminuria. She had no history of retinopathy or neuropathy. Other than the diabetes, her medical history was relatively unremarkable. As of this date, Dr. Galagan noted her diabetes was under stable control. [Tr. at 151.]

On September 2, 2000, Dr. Galagan's record notes that the urine micro albumin level indicated mild diabetic kidney disease. [Tr. at 198.] Johnson was to schedule another appointment to improve her diabetes treatment.

On September 8, 2000, it appears that Johnson filled out a vision screening form. She had seen Dr. William Jones for her eyes. She states that on September 5, 2000, she had had a general diabetic six-month eye exam and that the doctor told her she had cataracts due to her age. She was also told supposedly that her eye problems were permanent due to age and diabetes. [Tr. at 113.] According to this form, the doctor advised Johnson to continue to monitor her blood sugars to avoid retina. She reported that she could see well enough to drive during the day but not at night. She could only read newspapers with bifocals. She could see the television but complained that she could no longer thread a needle to sew. Johnson needed glasses to read and sew. [Tr. at 113.]

On September 8, 2000, Johnson's daughter, Edythe Marmolejo, filled out a third-party daily activities questionnaire relating to Johnson's activities. [Tr. at 122.] Ms. Marmolejo reported that her mother loved to cook if she felt up to it. Otherwise, Johnson's husband and daughter helped her. The daughter confirmed that Johnson used to jog 3-5 miles before her auto accident but now rode the exercise bike at least 30 minutes. Johnson loved the outdoors and fresh air and loved being involved in very traditional Indian religion and ceremonies. [Tr. at 122.] Ms. Marmolejo stated that her mother lost her balance and that most of the time they held their mother's hand. According to her daughter, Johnson had friends in every state, and that she and her husband used to travel very often. Johnson loved to joke and make people laugh; she loved to share with relatives and friends. As for what activities caused her mother the most problems, her daughter was unsure but suspected cleaning might be a problem. Ms. Marmolejo reported that Johnson slept well. Johnson did hobbies

or activities at her own pace because she said that if she did not finish them it did not matter since she was retired. [Tr. at 124.] If under pressure, her mother's blood sugars rose and she got thirsty and had dry mouth. The daughter could not answer how her mother's behavior had changed. Johnson appeared to be mentally alert and said she was happy being retired. Her daughter stated that her mother probably could not function at a job anymore because of her medical condition. [Tr. at 125.]

On October 28, 2000, Dr. David Green, a disability consultant, noted Johnson's prior eye exams and her 20/20 correction to both eyes. She had no problem with her retinas or neuropathy. She had had a normal physical exam. She weighed 160 pounds. Her medical allegations were deemed non-severe. [Tr. at 147.]

In late October 2000, Johnson's underlying disability application was denied. [Tr. at 48, 50.]

On December 11, 2000, Dr. Galagan saw Johnson for her diabetes. Most of her home readings on her blood sugars were between 110-170. Her blood pressure was stable. This time, Dr. Galagan noted that she had insulin requiring diabetes with unstable control. [Tr. at 149.]

On December 12, 2000, Johnson filled out a reconsideration disability report. She stated that she had pain in her wrist, palm, and thumb, along with swelling. Her fingers hurt from needle holes. Her body hurt more from needle bruises from insulin shots. She was depressed with trying to deal with her diabetes. She could no longer dress without help from her husband. Her husband helped her bathe, wash her hair, and put on her shoes. He did most of the cooking and cleaning. Johnson could no longer chop wood. Her husband did most of the physical chores. Johnson could no longer walk one-two blocks because she became too tired. [Tr. at 126-28.] She stated that she knew she could not function any more on a job or perform duties for an employer. She described her last month at work as being very stressful. Every day, she got upset and depressed as she looked at her

10

fingers full of needle holes from pricking them to test her blood sugars. Her fingers hurt very much. She also was upset to see her body with needle marks from her insulin shots. Johnson stated that she prayed, cried and massaged those areas, but they still hurt.

On January 13, 2001, Johnson filled out her second daily activities questionnaire. [Tr. at 132.] She reported that she got up at 6 a.m. She could not sleep any later or she started shaking from hunger. She did her daily diabetic routine, i.e., testing her blood sugars and taking medications. She spent the day with her husband. She stated that her life changed after the car accident in 1997. Johnson tended to lose her balance after the accident because of her balance. She became very depressed looking at her bruised body from the needle marks. It was too hard to concentrate and she could not work for an employer. Her husband helped her with her personal needs. She still tried to dust the house, but her husband and daughter did most of the cleaning. She tried to mop if no one was home. She did not shop, and her husband cooked. She could drive a car, but only in an emergency. She participated in traditional Indian ceremonies. Johnson always needed to be near a restroom. Her hobbies were being with her family, visiting and listening to current events. [Tr. at 134.] She became depressed because of her tingling fingers. She could not grasp objects. She used to love to embroider and sew. She liked to read the newspaper and her devotions. She needed help taking her medications, especially reading the instructions. At her last job, her caseload was 1200 cases or more. She had to use 6 Indian languages on the job. Governor Johnson placed the employees on a quota system and it was difficult to keep up with the work. All of that stress made her diabetes worse. (Tr. at 136).

On February 6, 2001, LeRoy Gabaldon, Ph.D. filled out a psychiatric review technique form for Johnson. [Tr. at 171.] He found her impairments non-severe. Her depression was related to a

physical condition but it did not satisfy diagnostic criteria for listing 12.04. The degree of limitations was mild as to restrictions of daily activities, maintaining social functions, maintaining concentration, and there were no restrictions as to repeated episodes of decompensation. [Tr. at 181.] Johnson had no history of psychiatric hospitalization. She was cognitively in tact without evidence of an ongoing thought disorder. [Tr. at 183.]

Also on February 6, 2001, the request for reconsideration of Johnson's prior denial for benefits was denied. [Tr. at 49, 56.] In June, July, August and September 2001, Johnson was attending the diabetes self management center and was receiving instructions on how to manage her diabetes. [Tr. at 189-92.]

On November 16, 2001, Johnson requested an ALJ hearing. She noted that she had a permanent MVD disability card. She stated she was unable to work now and needed benefits. [Tr. at 59.]

On January 2, 2002, Johnson filled out a statement, claiming that since the date of her reconsideration request, she stumbled more, her left thigh was weaker, her wrist hurt, her thumbs were numb, she was depressed from having to stick her fingers to test her blood sugars, and she was agitated with respect to dealing with her medications. She moved more slowly, her personal hygiene needs took longer, she tended to lose her grip and break more dishes because of her fingers. [Tr. at 138.] On January 21, 2002, a bond densitometry report indicated abnormal bone mineral density and osteopenia. Johnson's risk of fractures was increased. the imaging study of her spine was suggestive of severe structural abnormalities. She met the requirements for pharmacologic intervention. [Tr. at 193.]

On March 6, 2002, Dr. Goldman, a disability consultant, filled out a psychiatric source statement of Johnson's ability to do work related activities (mental). [Tr. at 207.] Dr. Goldman found that Johnson was mildly limited in understanding and remembering instructions. She was moderately limited in her ability to carry out instructions, work without supervision, engage in social interactions with the public, supervisors and co-workers, and adapt to change in the workplace. [Tr. at 208.]

On April 13, 2002, Dr. Gerald Fredman performed a psychiatric evaluation for disability services. [Tr. at 203.] Dr. Fredman noted that Johnson's primary complaints were diabetes and her car accident in 1997. She had been on insulin for 15 years and had been followed by Dr. Galagan, an endocrinologist. In 1997, she suffered a hematoma injury to her left thigh after the car accident. "After that I got real weak and more depressed." Johnson told Dr. Fredman that she continued to work, however, until she retired on June 1, 1999. She also said that she had had a head injury with loss of consciousness in the accident but did not recall the length of her black out. She was taken to urgent care, examined and released. She went to an orthopedic surgeon and was hospitalized so that the hematoma on her left thigh could be removed. She remained in the hospital for one month. [Tr. at 203.] She was depressed since the diagnosis of her diabetes in 1976 but her depression worsened after the car accident. She was treated by a traditional medicine healer for depression but was not then taking anti-depressants. She had tried Prozac in the past but discontinued it due to side effects. [Tr. at 204.] She felt moody, and she cried when she had to "stick herself" several times a day. Her hands began to shake and she had periodic sleep problems. Johnson described her energy level as slow after the car accident and said her leg "pulled her down." She had a driver's license but limited her driving. She used a stationary bike to exercise.

13

Dr. Fredman noted that Johnson appeared somewhat anxious. [Tr. at 205.] His assessment was that she had a history of mood disorder since her diabetes diagnosis in 1976, with her depression worsening in 1997. She continued to exhibit "vegetative symptoms of depression," including sleep disturbance, diminished energy level, diminished concentration, social withdrawal and a variable appetite. His Axis I diagnosis was major depressive disorder, recurrent, moderate to severe. He assigned a GAF of 52 – moderate to severe. Johnson's prognosis without psychiatric care was guarded in Dr. Feldman's opinion; it was fair with care. She would have mild limitations understanding and remembering basic instructions, mild limitations in concentration, moderate limitations in persisting in a task at basic work, interacting with the public an co-workers and adapting to changes. [Tr. at 206.]

On August 30, 2002, Dr. Galagan filled out a medical source statement of Johnson's ability to do work related activities (physical). [Tr. at 199.] Her abilities to lift or carry were not affected by the impairment, although Dr. Galagan then stated that Johnson both could lift 10 pounds occasionally and frequently. Her abilities to walk and stand were affected by the impairment, and she could walk and/or stand less than 2 hours in an 8-hour work day. Her ability to sit was unaffected. She had limited ability to push or pull in the lower extremities, and was occasionally limited in her abilities to climb, balance, kneel, crouch, crawl and stoop. She was limited her abilities to reach, handle, finger and feel because of carpal tunnel syndrome of her right hand. Her abilities to speak, hear and see were unlimited. [Tr. at 201.]

On September 6, 2001, the ALJ conducted Johnson's administrative hearing. [Tr. at 33.] Johnson was not represented but was notified of her right to proceed with representation, and she said she understood this. [Tr. at 35.] Judge Vanderhoof then stated he understood she had some

college so that he would permit her to proceed on her own. [Tr. at 35.] Some of the testimony that the ALJ elicited from Johnson is as follows: she wore eye glasses which she needed to read and drive; she had a driver's licence and drove one mile per week; her grandson drove her to the hearing; she did not feel she could lift more than 5 pounds; she took retirement when she left her work with the state because she had enough time in the system to retire and because after her accident she had a more difficult time getting around at work; she received $1283.00 per month in retirement and an additional $781 in social security; she hurt her left side and had a hematoma as a result of the car accident (in 1997); she had diabetes since 1976 but did not use crutches or a cane; she was taking oral medications for the diabetes but now was on three different types of insulin; her blood sugar range was between 189-200 an hour or two after she ate; her blood pressure had gone up on the prior Friday and so her blood pressure medication was increased; she believed she could walk and be on her feet for 30 minutes before needing to sit down; she could sit for 15-30 minutes at a time; she could not bend her left leg; she had a bladder problem and needed the bathroom every 20-30 minutes; on a typical day she got up at 4:30 a.m. from her old work routine, did her blood sugars, ate breakfast and took her medications; her husband helped her with breakfast and helped her with showering; she was able to go outside; she had visitors and friends over most of the time; and she sang Indian songs in her native tongue and went to tribal ceremonies. [Tr. at 33-47.] The ALJ did not call a VE to testify at this hearing.

On October 21, 2002, Judge Vanderhoof issued his written decision denying Johnson's application for DIB benefits. [Tr. at 15-27.] His findings were described above. On June 25, 2003, Johnson provided an affidavit statement discounting Dr. Smith's June 21, 2000 statement regarding her daily ranch work. [Tr. at 217.] Johnston stated that she was examined only once by Dr. Smith

and that he was not her primary doctor.  She noted that she did not do any farm work and that she and her husband did not have a farm; nor did they own their own ranch.  Johnson testified, however, that she and her husband had some cattle with 20 other owners in an association, which collectively maintained the herd.  The association land was not near her home and all she did with respect to the herd was to ride to the land with her husband in the pickup occasionally.  [Tr. at 217.]

**Discussion**

In this appeal, Johnson asks for a reversal of the ALJ's findings and decision or an Order remanding the case.  In her motion, she claims generally that the findings of fact by the Appeals Council and the ALJ were not supported by substantial evidence.  More specifically, she alleges that the ALJ's evaluation of her mental and physical impairments was not made in accordance with the pertinent regulations and was not supported by substantial evidence.  Johnson also asserts that the evidence demonstrated she was unable to perform her past relevant work or any other type of work due to her mental and physical impairments whose combined effect should have been considered.  In her supporting brief, Johnson argues that the ALJ failed to develop the record an disregarded relevant evidence in the record.  In her brief, Johnson also briefly attacks the ALJ's decision on a number of other grounds including the ALJ's credibility findings and his failure to find a medically severe impairment equal to a listing.   The Commissioner claims that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations.

## I.   DUTY TO DEVELOP AND EVALUATE THE RECORD

While it is beyond dispute that the burden to prove disability in a social security case is on the claimant, "[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." Carter v. Chater, 73 F.3d

1019, 1022 (10th Cir.1996). *See also* Henrie v. United States Dep't of Health & Human Servs., 13

F.3d 359, 360-61 (10th Cir. 1993); §§ 20 C.F.R. 404.944, 416.1444 (requiring ALJ to look fully into

issues); Social Security Ruling 96-7p, 1996 WL 374186, at *2 n. 3 (requiring ALJ to develop

"evidence regarding the possibility of a medically determinable mental impairment when the record

contains information to suggest that such an impairment exists"). This duty is heightened when the

claimant proceeds *pro se*. *See* Henrie, 13 F.3d at 361.

Johnson's first argument is that the ALJ erroneously insinuated that Johnson did not need a

representative at her administrative hearing, based on the ALJ's comment that she had some college

education. The Court finds no error as to this point. Johnson acknowledged that she was notified

of and understood her right to representation. However, the general duty to develop the record is

heightened because of Johnson's *pro se* representation at the hearing.

Johnson next argues that the ALJ's credibility findings were erroneous and/or not supported

by substantial evidence. In his findings, Judge Vanderhoof stated generally that he did not find

Johnson's allegations regarding her limitations totally credible for the reasons set forth in the decision.

[Tr. at 26.] Along with this statement, the ALJ carefully and fully discussed in the body of the

decision why he discredited Johnson's credibility as to some of her alleged impairments.

For example, Johnson asserted that she could no longer work because of blurred vision. Yet,

near the time she retired, Johnson had eye exams that were essentially normal. Her vision was

corrected to 20/20. Nothing in the exams indicated atrophy, blurred vision or complications because

of her diabetes.

Johnson's representative attorney argues that the ALJ had a duty to ask her at the hearing

about her complaints about blurred vision and other alleged impairments. Plaintiff was not

represented by counsel at the September 2002 hearing. Moreover, it is true that the ALJ has a basic duty of inquiry "to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts[,]" Heckler v. Campbell, 461 U.S. 458, 471 n. 1 (1983) (Brennan, J., concurring).

Here, during the hearing, Johnson made several references to her ability to see and/or read in response to the ALJ's questions. Indeed, she did not raise any allegation of blurred vision at the hearing, and the ALJ observed that she did not testify that she had any visual impairments related to her diabetes. [Tr. at 24.]. She noted that she could see well enough to make sandwiches, drive a bit and watch TV, even though she was not a TV person. [Tr. at 43-44.] She stated that she needed to use a magnifying glass to read tiny print. However, the fact that at age 60 or 62, Johnson needs glasses to read, drive or thread a needle, and/or assistance to read fine print is not particularly surprising. The ALJ thoroughly addressed the vision records and evidence on which he relied to discount Johnson's allegations that blurred vision interfered with her ability to work. [Tr. at 20.] Thus, the Court determines that the ALJ's credibility findings as to Johnson's alleged blurred vision were not erroneous and were supported by substantial evidence.

Johnson mentions the ALJ's credibility findings regarding Johnson's obesity and bladder problems, and yet sets forth no argument as to why those findings were erroneous or lacking in evidentiary support. Thus, the Court does not address those arguments here.

Johnson implies that Judge Vanderhoof relied on certain records to support his credibility findings that Johnson did not have foot problems, and yet ignored one record that showed she requested a referral to a podiatrist. Again, Johnson provided no testimony at the hearing that she had a problem with her feet due to diabetes or any other condition. In his decision, the ALJ thoroughly

considered the doctor's reports indicating that Johnson had no foot problems, no sores and no ulcerations. Moreover, Johnson's representative incorrectly states that Judge Vanderhoof failed to consider the 12/99 medical record when Johnson asked for a referral to a foot specialist.[10]  His opinion explicitly discussed that record, along with the record six months later reflecting that Johnson again told the doctor her feet were fine. [Tr. at 20.]  Thus, the Court concludes again that substantial evidence supports the ALJ's credibility as to Johnson's allegations regarding a foot problem.

Johnson next argues that the ALJ improperly discounted her credibility as to her depression and improperly failed to ask her about the depression at the hearing.  The ALJ did not find that Johnson had a "severe" depression for any continuous 12-month period at issue. [Tr. at 21.]  In so finding, Judge Vanderhoof devoted almost two pages of his decision discussing the evidence or lack of objective medical evidence supporting a finding that Johnson's alleged depression was a severe impairment.  For example, while Johnson mentioned her depression on social security forms, particularly in reference to her needle marks from insulin injections and pin pricks on her fingers from testing her blood sugars, the ALJ observed that almost none of the medical records documented depression.  Only one April 1999 medical record reflects a treating physician comment that Johnson "does get somewhat anxious at work at times." [Tr. at 169.]

Judge Vanderhoof also noted the many other medical records that document Johnson was feeling fine and doing very well.  Johnson had never required any psychiatric hospitalizations, although she apparently had been on Prozac at some point in the past.  There is no evidence that she

---

[10]Johnson's attorney is similarly mistaken when she argues that the ALJ never addressed the medical evidence regarding Johnson's sensation in her feet being mildly decreased.  The ALJ's decision did address this record. [Tr. at 20.]  Johnson's representative also argues that the ALJ did not discuss a medical record stating that on one occasion Johnson's diabetes was "with unstable control," and yet again, the ALJ did discuss that record. [Tr. at 23.]  Moreover, it is Johnson who overlooks the part of a medical record noting that any diabetic nephropathy she had was "of a mild degree." [Tr. at 169.]

saw a psychologist or counselor for depression.  In a document filled out by Johnson on June 21, 2000, Johnson did not mark the blank space next to depression indicating that this was an ailment she had.  However, she did mark diabetes.  [Tr. at 155.]  As to the pertinent time frame, Johnson was seeing a traditional medicine healer and was not taking any type of antidepressant medication.  [Tr. at 21.]  Lack of treatment is an indication of non-disability.  Bean v. Chater, 77 F.3d 1210, 1213-14 (10th Cir. 1995).

Only one medical record supports Johnson's allegations of depression, that of Dr. Gerald Fredman, a consultative psychiatrist.  Judge Vanderhoof thoroughly discussed why he discounted Dr. Fredman's April 2002 exam and conclusions.  [Tr. at 21-22.]  For example, Dr. Fredman recorded that Johnson had had a mood disorder since the diagnosis of diabetes in 1976 and yet she continued to work a full 8 hour day until she retired for many years, and apparently without the assistance of counseling or anti-depressant medication.  In addition, the ALJ noted the internal inconsistencies of some of Dr. Fredman's documentation of his exam of Johnson.

It is true that the ALJ did not specifically ask Johnson about her alleged depression at the hearing.  However, Johnson was asked if she got along okay with her husband, and she responded "definitely", with no indication that depression interfered with her personal relations.  [Tr. at 42.]  Johnson volunteered during the hearing that she was a very active person (referring to dancing at tribal ceremonies and jogging) and "that just depresses me that I can't do that anymore."  [Tr. at 45.]  She also testified, however, that she went outside, was able to socialize with visitors, and attend tribal ceremonies.  [Tr. at 45.]  The Court concludes that in reaching his decision, the ALJ was informed about facts relevant to his decision and he did learn the claimant's own version of facts.  Thus, substantial evidence supports the ALJ's credibility findings as to Johnson's alleged depression.

For all of the above stated reasons, the Court concludes that there is no evidence demonstrating the ALJ violated his duty to develop the record and/or that his credibility findings were erroneous or lacking in substantial evidentiary support.

## II. RFC FINDING

The ALJ determined that Johnson retained the RFC for a limited range of light work: 4 hours of standing/walking per day; sitting without limitation; occasional bending, crouching, reaching and kneeling. She could lift and/or carry up to 10 pounds occasionally. She could write, type and handle small and large objects during the work day. [Tr. at 25.] After determining her RFC, Judge Vanderhoof concluded that she would return to her past relevant work based on her description of that work. [Tr. at 26.]

Johnson claims this finding was erroneous because the DOT definition of light work exceeds her limitations. "The burden is on the claimant to show that [his] impairment renders [him] unable to perform [his past relevant] work." Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360 (10th Cir.1993). Here, unlike Henrie, 13 F.3d at 361, Judge Vanderhoof had information about the demands of Johnson's past job, as well as information about her physical capabilities. Moreover, a claimant is able to perform past relevant work if she can perform " '[t]he actual functional demands and job duties of a particular past relevant job.' " Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045, 1050 (10th Cir.1993) (quoting Social Security Ruling 82-61, 1982 WL 31387 (1982)). The ALJ concluded that Johnson had certain limitations, based on a review of the records.

However, the ALJ decided that Johnson's RFC did not preclude her from returning to the child support enforcement officer position based on her description how she performed that job.

21

After considering Johnson's RFC, the objective medical evidence and her description of her actual job duties, the Court is satisfied that the ALJ had sufficient information as to the physical demands of Johnson's prior work based on her descriptions of that work, and that substantial evidence supports the ALJ's determination that she could perform the actual duties of that work. Thus, the ALJ's finding was not erroneous and was supported by substantial evidence.

Johnson also argues that in reaching the RFC findings, the ALJ improperly discounted the treating physician's statement as to what limitations Johnson had. It is true that on August 30, 2002, Dr. Galagan filled out a medical source statement with respect to Johnson's ability to do work related activities and that he stated she could only stand or walk less than two hours per work day. He also concluded that she had some restrictions in her finger manipulation/dexterity because of carpal tunnel syndrome in her right hand. [Tr. at 199.] However, as appropriately noted by the ALJ, when Dr. Galagan filled out this form, he had not seen Johnson in over 1½ years and apparently had not seen her near the time he filled out the medical source statement. The ALJ gave little weight to this report of Dr. Galagan's because he had not recently examined her and there was no evidence that he conducted any physical examination or testing of Johnson near the time of his August 2002 statement. [Tr. at 24.] Moreover, there was absolutely no objective medical evidence to support a diagnosis of carpal tunnel syndrome. [Tr. at 24.] Under these circumstances, the ALJ properly discredited this isolated report by Dr. Galagan even though he was a treating physician. A treating physician's opinion may be rejected if his conclusions are not supported by specific findings. Castellano v. Sec'y of HHS, 26 F.3d 1027, 1029 (10th Cir. 1994).

Johnson's representative also appears to present another challenge to the ALJ's credibility determinations with respect to the RFC. Johnson argued that the ALJ improperly assumed that

Johnson quit her job in May or June 2000 based solely on her desire and eligibility to retire. She contends that "she was able to retire without being penalized by an early retirement, when she became unable to perform her duties", implying that she had to stop working because of her limitations. However, first, Johnson does not cite any record evidence as to the quoted language. Second, many of Johnson's disability documents and forms state that she retired at the time she did because she was eligible under the state's system. Certainly, there are no contemporaneous documents indicating that she quit her job because of a disability or the inability to do the job. The ALJ observed that Johnson's allegations of chronic, disabling impairments were refuted by the fact that she claimed disability very close to the day she quit performing a substantial gainful activity. Moreover, this timing reflected adversely on her overall credibility. [Tr. at 22.] The Court concludes that substantial evidence supports the ALJ's credibility finding as to the reason Johnson quit her job, and that there was no error.

## Conclusion

For all of the above-stated reasons, the Court concludes that Johnson's motion to reverse or remand [Doc. No. 11] should be denied, and that this matter should be dismissed, with prejudice.


_____
Lorenzo F. Garcia
Chief United States Magistrate Judge